All right, our next case is Abramowski against, I don't know, is it Nuvei and Nuvei? Nuvei Corporation, 24-3156. Mr. Farrell, it's all yours. May it please the Court, Derek Farrell, on behalf of all four of Bleach, Mara, Fonte, and Holt, on behalf of the appellants who are the plaintiffs below. With the Court's permission, I'd like to reserve five minutes for rebuttal.  The question before the Court today is whether appellees complied with the best price rule of the Williams Act when the appellees offered to purchase, quote, any and all of the issues and outstanding shares of common stock, end quote, for $9.75 per share in cash. Appellees acquired these shares through a tender offer pursuant to Section 251 of the Delaware General Corporation Law. Tendering stock under 251 is the equivalent of voting the shares. It's different from purchasing the shares. And I think a good way of thinking about this is comparing what would happen in this situation in a tender offer to a long-form merger. So if you were to do this transaction in the context of a long-form merger, my clients would have been able to vote their shares. Between the time they voted their shares and the close of the tender offer, which can take a very long time sometimes, the shares would have been freely traded. And then right before the tender offer would have closed, the shares would have been forfeited pursuant to the terms of the shares. In that situation, my clients would not have been owed the $9.75 per share. The timing is different, however, in a tender offer. In a tender offer, when the shares are tendered, at that point in time, the right to payment arises. And at that point in time, you actually physically give the shares over. You see this in the transmittal letter here. It's at Joint Appendix 443. And it sets forth the procedure by which the physical or electronic share certificates are moved over to the seller. So at this point in time, you can't freely trade them anymore. And so it makes sense that that is when the payment obligation arises. But I guess I'm questioning that because I'm just not sure that the rule applies at all, given that it's the implementing rule for the statute. And the statute specifically says that it applies when securities are taken up and paid for. I mean, you seem to be trying to use the rule to control the timing of the payment. But the rule seems to say that the shares have already been taken up and paid. So, I mean, I'm not sure that the plain text of the statute doesn't foreclose your argument. And the other reason I'm wondering, I'll just put them all out here so you can address it, is I understand that your argument is that there was a change in price, but the $9.75 price was the price from the beginning to the end. It seems your real argument is just you didn't get paid at all, which, again, is about the timing of the payment, rather than once your shares have actually been, have been taken up and paid for. So, I mean, I understand your argument that they should have, but the best price rule doesn't seem to address that situation at all. I think the best price rule and the all-holders rule, and I believe Your Honor is talking about Section D7. And so I think here we need to focus on the rules that were enacted by the SEC, which would be the best price. But the statute controls. The statute does control. And then the question is whether there is a private right of action and whether the SEC exceeded their authority. And in Phil versus Trump, the Second Circuit said there was very plainly a private right of action to enforce the best price. I'm not focusing on that. I'm just saying by the plain text of the statute, why does it apply at all? Because it's not about the timing of the payment, which is your argument. The plain text is if the shares have been taken up and paid for, and there's no dispute that these earn out shares were never taken up and never paid for. They were never paid for. But again, I would focus instead on the plain language of the best price rule, which says that the consideration paid.  So can you tell me what's your argument that they were taken up? The argument that they were taken up? Yeah, the statutory language. You're focusing on the implementing rule, but the statutory text is that they have to be taken up and paid for. So I just would like to hear it. There seems to be no dispute that they were never taken up and paid for. They were never taken up and paid for on the back end, but they were taken up in the sense that the share certificates were given over at the time my clients tendered. Okay. And so do you have a case that says that when they are tendered, that is considered taken up under the statutory text? I'm not aware of any case going either direction on that specific issue. So I don't believe it's actually answered. So the best, as I see it, the best price rule is about price. It's about consideration. If you pay this amount of consideration for any share, you have to give that same consideration for all the other shares that are tendered. But does the best price rule say anything about the conditions that might apply to accepting tendered shares or whether the offeror must accept tendered shares? That seems to be, as I read it, the best price rule doesn't address that issue at all. I believe WHX actually has addressed this issue in interpreting the rule. And what WHX says is that where the person that is buying, sorry, the tenderer takes actions that impact the shares, such as if you put them for a loan or you were to put them in a trust, and in a trust there may be an approval requirement. Those are all things that the stockholder is taking on to encumber the shares. That is perfectly appropriate under rule. But here what we're talking about is the actual terms of the shares. And the all-holders rule, that's actually what addresses the terms of the shares. And it says you need to hold it open to all shares of the same class. And below what my friends argue, these were a different class of securities under the all-holders rule. They made the conscious decision, not us, to include our client shares in the class. So they avoided their all-holders rule problem by doing that. Now they must accept the consequences of that decision. I would also say that when they talk about the Epstein case and they say, oh, well, this doesn't apply to preexisting agreements, that's misstating what the Epstein case is talking about in context. In Epstein, you have to remember what was going on where there was a separate transaction with the company's chairman and the company's chief operating officer. And the question before the court was whether or not that was a separate transaction under the best price rule or the same transaction. And that's the context in which the court says, of course, you know, there may be preexisting agreements to which it wouldn't apply. And so that's not at issue here. They also refer to the 2006 amendments to the best price rule. And they say, well, this allows for preexisting contracts. But if you look at the just summary of the rule and the very first few sentences, the amendment makes very clear what it's talking about is employment agreements. And in fact, the 2006 amendments overruled Epstein, which was dealing with an employment type agreement. And they said, you know, there are good reasons why we want to make those different. And so we treat them differently under the rule. I want to also just briefly address this argument that by paying nothing, you avoid the best price rule. And the problem with this is that this leads to a situation where the rule is completely toothless. Because you could simply avoid the best price rule by paying nothing. And it's particularly problematic in the circumstances of this case. Because here what happened was is they waited until after the tender offer closed when my client couldn't do anything about it. And at that point in time, they rejected the tender. So what this allows to happen is you can come in and say, I want to know if I have enough votes, enough tenders. And if you have enough at the time the tender offer closes, on the back end you could say, you know what, I don't want to pay these people. I want to save the money. It also leads to another absurd result, and that is that by paying one penny for the shares instead of paying nothing for the shares, that you end up having to pay under one penny, $9.75, but nothing if you don't. So I agree that the language about paying nothing is sort of implicit. In my view, the more interesting question is whether a combination of state law and the party's contractual obligations can take certain shares out of the best price rule. Because they just don't have to be accepted. Well, here I believe where they were focused on taking it out was under the actually purchased issue, which was actually a letter transmittal. And the court should remember this is not even attached to the merge agreement. The merge agreement just had this idea there would be a form agreement. And they're focused on the word restrictions. And it talks about liens, restrictions, and encumbrances on the shares. And if you read that in context, this is directly consistent with what the court held in WHX. And that is where the stockholder takes action. But they want to assign, as someone said earlier, a talismanic meaning to the issue. They want restrictions to mean restricted shares. But I'd submit that when you look at it in context, it's actually talking about the same types of things that WHX is talking about. And the issue of the terms of the shares is actually addressed under the all-holders rule. If the all-holders rule, I know this is not your argument, but if it doesn't apply, then what law does govern this? Is it state law? Is it the party's own agreements? The only issue on appeal is compliance with the best price rule. So if the all-holders rule does not apply, then the best price rule would not apply. And they could have avoided their problem by not holding it open under the all-holders rule. Thank you. May it please the court, Brian Bernofsky on behalf of defendants. Your Honor, as I think was clear from the prior statements, this is a very narrow case, whether the SEC's best price rule allows plaintiffs to evade the consequences of the contractual bargain that they voluntarily struck when they got the earn-out shares in PAIA. We respectfully submit that the answer is clearly no. The contractual bargain was simple. If there was a change in control in PAIA at a price less than $15 per share, the earn-out shares would be automatically forfeited immediately prior to the consummation of the change in control. That's an agreement that plaintiffs, indisputably in this case, were bound to. Plaintiffs sort of try to compare this to WHX in a favorable way, but I don't actually see how WHX helps them. WHX basically says if the tenderer voluntarily encumbers their shares in some way that makes the shares ineligible to be tendered in the tender offer, then that's fine. The SEC doesn't have a problem with that. That's not a problem under the rules. That's exactly what happened here. Plaintiffs voluntarily entered into the sponsorship support agreement. The sponsorship support agreement provided for forfeiture, and that's the situation we have here.  Assuming that, to stipulate what you just said, does the best price rule prohibit or impede parties from honoring those sorts of preexisting contractual obligations? No, I think that's exactly what WHX says, and frankly, I think that's what Epstein says as well. Epstein's obviously in a slightly different context. The question there is whether there are contracts to provide consideration to someone, whether those contracts are sort of part of the tender offer itself, and the Ninth Circuit noted that if the contracts precede the tender offer are completely separate, that's fine as long as they're not part of the tender offer. So I think the short answer to your question, Judge Porter, is no. I guess I would say, as the district court correctly held, a buyer can't purchase shares that the seller doesn't own, and there's nothing in the best price rule that requires a buyer to pay consideration for shares that it didn't actually purchase. What the best price rule says is you can't make an offer. What the best price rule does is it precludes an offeror from buying shares in a tender offer at different prices from different shareholders. In other words, when you're actually purchasing the shares, when there's a mutual exchange of consideration, shares for value, you've got to pay the same price to everyone you're actually buying shares from. What law do we look to to determine whether the offeror must accept tendered shares? What law must we look to? Or if he can put conditions on the acceptance of tendered shares? State law. The validity of the contract, the sponsorship support agreement. These SEC rules don't have any bearing on that question? It would only have a bearing on the question if the tender offeror is engaging in some sort of contractual manipulation to avoid the rule. But here you've got a previously existing contract. There's no dispute that the contract is valid and enforceable. There's no dispute that the plaintiff's voluntarily entered into this contract. I don't think they could use the best price rule to evade the consequences of the bargain they struck. I don't think there's anything in the rule itself that would require that outcome. I guess the argument is the best price rule talks about shares that are tendered. It doesn't say shares that are validly tendered or something like that. I'd like to talk about that. I think the textual points I would make is, and this is a point that the district court made, which is the rule requires that the consideration paid to any security holder must be the same as the consideration paid to any other holders. Consideration paid necessarily assumes there's been a transaction, a mutual exchange of shares. The argument that you heard from my friends on the other side is we paid $0 for these shares. That defies reality. We didn't buy the shares because the shares didn't exist at the time the shares were accepted. Because they've been forfeited. Exactly, because they've been forfeited. That happened automatically. The sponsorship support agreement says when they get forfeited, the shares get canceled. They no longer exist. We didn't have shares to buy. There is no mutual exchange. Unless there's a timing issue, right? Correct, but I don't believe there's a timing issue. I think the district court addressed the timing issue. I think it's pretty clear. I'm happy to address that if Your Honor wants. The way the forfeiture works is it gets forfeited immediately prior to a change of control. A change of control is defined as acquiring more than 50% of the voting stock. The tender offer resulted in acquiring more than 50% of the voting stock. As the district court correctly held, the change of control happened, was consummated, when Nouvet irrevocably accepted the shares for purchase. That was defined as the acceptance time. That happens after the expiration of the offer. And the shares get forfeited prior to the consummation, prior to the acceptance time. So by the time Nouvet was ready to accept any shares that had been validly tendered in the offer, There's that word validly again. The best price rule doesn't say that. It says securities tendered in the offer. Correct, but again, I think this is covered by WHX, right? I mean, if a plaintiff voluntarily encumbers their shares prior to any tender offer, having nothing to do with the offeror, such that they are not eligible to be tendered into the offer, that's not a problem. So why do we have to rely on forfeiture at all if there wasn't a valid tender? Look, I think forfeiture is part of why there wasn't a valid tender. The anticipation of forfeiture. Correct. I mean, we could get into a debate about what valid means, but I think that the reason I sort of focus on forfeiture is I think it's the simplest way to think about it. What does it mean for a tender to be valid? It means you have the power to sell the stock. You don't have the power to sell the stock if you know that the stock won't exist at the time the transaction is consummated. I mean, I think that's sort of how we obviously make other arguments in our papers as to why it wasn't validly tendered and other restrictions that were applicable to the stock. But I don't even think the court needs to get to those points because it's so plain and obvious that if you don't have the power to sell the stock because you know you're not going to own the stock at the time of the closing, you know, it's not a valid tender. And again, you know, what the best price rule says is if you're going to actually buy the stock, you've got to pay the same price to everyone you're buying it from. But otherwise, you know, the best price rule, as I think the court has already recognized, just doesn't apply. I guess a couple of additional points here on this. Plaintiffs place a lot of weight, at least in their papers, on the fact that the district court explained its reasoning by adding the word actually to the text of the rule. I respectfully submit that's a red herring. What the district court did is make the point that I just made, which is there actually has to be a transaction. Implicit in the rule is that there was a transaction. And Judge Chung, this goes to your point as well, which is that's entirely consistent with the language of the text, sorry, the text of the statute, which says take up and, well, I don't have it here. But you don't dispute if the shares had been taken up and zero consideration was paid, then the best price rule would apply. Correct. I totally agree. That part of the district court, you don't quibble with the notion that zero consideration is not consideration. If, in fact, it was there was an exchange or taking up. I think that's the point. Zero consideration is no consideration. There is no transaction. Of course, if we had taken the shares and kept the shares and got the shares and we paid nothing for them, that would be a different story. But that's not the situation here. The share simply didn't exist at the time of acceptance. When I asked your friend about taking up the shares rather than the price paid for the shares, he said that that gets to the all holders rule, not the best price rule. Can you address that? Do you remember that? Yeah, I do. Well, I guess I would say this. I think that is probably the way that most people would think about it. I mean, I think Judge Chung makes a good point about the language in 14D7 or 14D107, which does include that specific language. I think it is commonly understood that that part of the statute is at least notionally the basis for the best price rule. Obviously, we argue that the best price rule, part of our argument is that the best price rule exceeds the statutory scope because it goes beyond what's actually in 14D107. But I guess... So the tender offer has to, under the all holders rule, the offer has to be open to all security holders of the class of securities subject to the tender offer. These are now shares, part of the class of securities subject to the tender offer. Sorry. Start over. The all holders rule says that the tender offer has to be open to all security holders of the class of securities subject to the tender offer. And then my question was, were these earn out shares part of the class of securities subject to the tender offer? They were, and the court says the offer was open to them. But obviously, per the terms of the contract that plaintiffs entered into, plaintiffs were not security holders. So I guess the real question is, does either the all holders rule or the best price rule prevent parties from entering into contracts like that that put conditions on their shares? Again, I would point to WHX, and the SEC said no. And I think the Ninth Circuit decision in Epstein stands for the proposition that the answer is no. Let me back up and talk about the purpose of the Williams Act, which was obviously to protect shareholders. It was enacted at a time when there was concern about improper or underhanded tactics by tender offerors making coercive offers to shareholders. I would respectfully submit that to apply the Williams Act or the best price rule or even the all holders rule in this context would be a complete perversion of the statute. It is a windfall to plaintiffs to say that, OK, you voluntarily entered into this deal. You got stock that you understood was incentive compensation that would only have value if it reached a certain price threshold. There was then a change of control that felt that indisputably fell below that threshold. At the time, well before this tender offer, you understood that in that situation, if there was a deal at a price below the threshold, you were going to get nothing. These shares would be worthless. And now to say, oh, well, you did a tender offer. You didn't do a long-form merger, but you did a tender offer. By the way, I would note one of the arguments they made is, well, you did a tender offer, so you got our votes. And so now you have to pay us for those votes. I think in their brief, they call it legal vote buying. But there's no dispute that we didn't count their votes in the deal. The threshold was well over the 50 percent to get control without any of their shares. I would also note that plaintiffs got paid for the shares that they owned that were not earn-out shares. So, again, with respect – and they got 975 for their shares. So with respect to the best price rule, again, when you buy the shares, when you get shares, pay the same price. That's all that it requires. Unless your honors have additional questions. I don't. Okay. Thank you. Thank you. Mr. Farrell. Your honors, I want to start off by addressing Judge Chown's comment on D7 and the language of the rule. First off, the court does have an option here of avoiding this issue because, for one, it wasn't briefed below. It wasn't briefed for this court, so the court could remand it down. But one thing I would point out is the court was focused on the taken-up language, and after it talks about purchasing shares taken up, the statute goes on and says request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation. So I think this gives the SEC more flexibility in developing a rule like it did under the best price rule. The other point I would make out is the one point I would make is that these shares always have the right to vote. No one denies that they have the right to vote. But what I just heard from my friends here is that my clients were disenfranchised, which is exactly what happened. Their votes were not counted. Had they structured this as a long-form merger, the votes would have counted. They shouldn't be treated differently because they're a tender offer, and they actually controlled making this as a tender offer. If they wanted to avoid their best price rule problem, as I pointed out, and I think Your Honors recognized, they didn't have to hold it open necessarily under the all-holders rule. They could have argued it's a different class and we don't have a problem here because the all-holders rule deals with the characteristics of the stock. I would also point out that on the validly tendered issue, that was also something that was not developed below, and so the court also has the option of remanding it. But everyone agrees you can't contract around the best price rule and the all-holders rule. So that's why, as Your Honors pointed out, validly tendered is not in there. The court should not get into that. What the court should look at is whether the shares were tendered within the meaning of the rule. And WHX has interpreted that to mean that it only applies when a stockholder encumbers the shares. And the SEC has also recognized this because in 1997, there was a Q&A with the SEC, and the question was, can you tender restricted stock? And the answer from the SEC was yes, you definitely can, but the shares then are taken up subject to the restrictions. So there's not a problem here in the SEC's eyes. Unless the court has any further questions, I have nothing further. The last point you made, the shares are taken up subject to the restrictions, but if the restrictions themselves say that the shares can't be taken up, then what happens? What happens is they're forfeited in the hands of the buyer. Remember, at the end of the day, the buyer is buying the entire company. So it shouldn't matter to them what bucket, whether they're forfeited shares or non-forfeited shares, the shares come in on. And at the end of the day, the shares existed at the close of the tender offer, and the tender offer is buying the votes. And they even recognize that in the offer to purchase because they speak to irrevocably accepting the shares for payment, which is exactly what happens here. They're buying the votes. They're not buying the shares. But the forfeiture occurs before the change of control. How could the buyers, how could the offerors take the forfeited shares when they're forfeited before the change of control? They bought the votes. They got the votes. They bought. And so they're stuck then with the shares, as the SEC says, subject to the restrictions. So here they're stuck with shares that were forfeited at the time of close because of how they structured this transaction, which they had control over, not my clients. OK. Thank you.